UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT



| UNITED STATES OF AMERICA | : | ss: Hartford, Connecticut |
| | : | |
| | : | November 14, 2018 |
| COUNTY OF HARTFORD | : | |
| | : | |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Gregory Macksoud, being duly sworn, depose and state as follows:

**<u>BACKGROUND</u>**

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been since April 2015.   I am currently assigned to the ATF Hartford Field Office, where my duties include investigating offenses involving individuals who unlawfully possess firearms, of individuals illegally selling firearms, and of individuals distributing illegal drugs.   I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.      On November 1, 2018, I signed an affidavit (hereinafter, the "Original Affidavit") in support of a Criminal Complaint for the arrest of Mohammadreza KAMALI, a.k.a. "Reza," for dealing firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A) and in support of applications for two search warrants: (1) for KAMALI's residence at 28 Chapman Street, Willimantic, CT; and (2) for KAMALI's email account, 860mohammadreza@gmail.com

1

controlled by Google, LLC.   The Original Affidavit, as redacted by order of the Court, has been attached at Attachment C and incorporated herein.

3.      On the basis of those applications and the Original Affidavit, on November 1, 2018, the Honorable Robert A. Richardson, U.S.M.J. issued an arrest warrant for KAMALI (the "Arrest Warrant"), and authorized search warrants for KAMALI's residence (the "28 Chapman Street Search Warrant") and KAMALI's email account (the "Google Search Warrant").

## PROBABLE CAUSE

4.      As set forth in the Original Affidavit, an ATF Special Agent acting in an undercover capacity (hereinafter "UC-1") engaged in two controlled purchases of firearms from KAMALI; the first occurring on October 18, 2018 wherein UC-1 purchased from KAMALI one AR-15 style rifle for $500, and the second occurring on October 25, 2018 wherein UC-1 purchased from KAMALI two AR-15 style rifles and one Glock style pistol frame for $1,350.   In connection with these purchases, UC-1 exchanged a series of text messages and voice calls with KAMALI to coordinate the time and location of the meetings, the nature and number of firearms that KAMALI would be selling to UC-1, as well as images or pictures of those firearms.   *See* Original Affidavit ¶¶ 29-31, 35-38.

5.      During the October 25, 2018 controlled purchase, KAMALI makes reference to the cell phone in his possession, which he explains to UC-1 is a "Samsung S8 Plus."

6.      On November 2, 2018, law enforcement officers including myself executed the Arrest Warrant for KAMALI in the vicinity of 1390 Main Street, Willimantic, CT.   Immediately leading up to KAMALI's arrest, UC-1 executed a third controlled purchase from KAMALI.   In that transaction, UC-1 proceeded to purchase from KAMALI one AR-15 style rifle and six firearm

magazines to UC-1 for a total of $620.00. During the exchange, KAMALI expressed disappointment that he did not have the firearms parts to sell additional firearms to UC-1 during this particular meeting, and showed UC-1 his cell phone, which had KAMALI's order confirmation for lower receivers visible on it. KAMALI told UC-1 that the lower receivers were shipping from Tennessee and that KAMALI had placed the order on October 25, 2018 and it was just shipped on November 1, 2018. Also during the transaction, KAMALI stated that his upper receivers would also be arriving in a few days, and again attempted to show UC-1 information about the order from KAMALI's cell phone.

7.     During the execution of the Arrest Warrant, ATF agents seized from KAMALI and placed into ATF custody KAMALI's Samsung Galaxy S8 Plus cell phone ("Device #1"), as set forth in Attachment A – Device #1.

8.     At the time of KAMALI's arrest, ATF officers also executed the 28 Chapman Street Search Warrant in the presence of KAMALI's father, Mohammad Kamali (hereinafter "Mohammad") who resided at 28 Chapman Street with his wife, KAMALI's mother, KAMALI, and KAMALI's two brothers. Mohammad told ATF agents that he (Mohammad) was aware that KAMALI was ordering firearm parts online and that Mohammad would pay for the parts through the website. Mohammad also stated that occasionally KAMALI placed orders that he did not know about in advance of receiving the package, and Mohammad believed that KAMALI was using a cell phone to place those orders. During the search, ATF agents seized from KAMALI's bedroom and placed into ATF custody a black Motorola XT1585 cell phone ("Device #2"), as set forth in Attachment A – Device #2. Other items seized from KAMALI's bedroom include a box

of firearm parts, an upper and lower receiver for a rifle, calipers and other tools, a plywood work

bench, and shipment packages.

## TECHNICAL TERMS

9.     Based on my training and experience, I use the following technical terms to convey

the following meanings:

     a.    Wireless telephone:   A wireless telephone (or mobile telephone, or cellular

telephone) is a handheld wireless device used for voice and data communication

through radio signals.   These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.   A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and

from the phone.   In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.   These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.   Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

     b.    Digital camera:   A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.   Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:   A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can also store any digital data.   Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:   A GPS navigation device uses the Global Positioning System to display its current location.   It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.   Each

5

satellite contains an extremely accurate clock.    Each satellite repeatedly transmits

by radio a mathematical representation of the current time, combined with a

special sequence of numbers.    These signals are sent by radio, using

specifications that are publicly available.    A GPS antenna on Earth can receive

those signals.    When a GPS antenna receives signals from at least four satellites,

a computer connected to that antenna can mathematically calculate the antenna's

latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:   A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.    Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.    PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.    Removable storage media

include various types of flash memory cards or miniature hard drives.    This

removable storage media can store any digital data.    Most PDAs run computer

software, giving them many of the same capabilities as personal computers.    For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.    PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f.   Tablet:   A tablet is a mobile computer, typically larger than a phone yet smaller

than a notebook that is primarily operated by touching the screen.    Tablets

function as wireless communication devices and can be used to access the Internet

through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

10.    Based on my training, experience, and research, I know that Device #1 and Device #2 are both wireless telephones known as "smartphones" that have capabilities that allow them to

serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, PDAs and tablets with access to Internet.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

11.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

12.     *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Device #1 and Device #2 were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence might be on the Device #1 and Device #2 because:

   a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.   Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

13.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Device #1 and Device #2 consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

9

14.     *Manner of execution.*   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## CONCLUSION

15.     I submit that this affidavit supports probable cause for search warrants authorizing the examination of Device #1 and Device #2 described in Attachment A for the items described in Attachment B as evidence, fruits, and instrumentalities of 18 U.S.C. § 922(a)(1)(A) (dealing without a license).

Gregory J. Macksoud
ATF Special Agent

Sworn to and subscribed before me on ___11/14/18___, 2018.

/s/  DFM

HON. DONNA F. MARTINEZ
UNITED STATES MAGISTRATE JUDGE

10

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

### Device #1

The property to be searched is one Samsung Galaxy S8 Plus cellular telephone bearing Serial Number SM-5955U and IMEI 357756080135615, which the ATF seized from Mohammadreza KAMALI on November 2, 2018.

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

### Device #2

The property to be searched is one Motorola Model XT1585 cellular telephone which the ATF seized from KAMALI's bedroom at 28 Chapman Street, Willimantic, CT on November 2, 2018.

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that constitute evidence of a potential violation of 18 U.S.C. § 922(a)(1)(A) (dealing firearms without a license), including but not limited to the following:

1.  any and all records, including any photographs, concerning the purchase, manufacture, sale, use, or transfer of any firearms (including parts or materials);

2.  the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the Device;

3.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the Device;

4.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

5.  any and all records, however created or stored, which tend to demonstrate ownership and use of the Device, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the Device;

6.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the Device, such as passwords, sign-on codes, and program design;

7.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

8.  saved searches, locations, and route history in the memory of the Device;

9.  internet browsing history, to include, internet searches in the memory of the Device; and

10. images and videos in the memory of the Device.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described Device may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

ATTACHMENT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | ss: Hartford, Connecticut |
| | : | |
| | : | November 1, 2018 |
| COUNTY OF HARTFORD | : | |
| | : | **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT AND SEARCH WARRANTS

I, Gregory Macksoud, being duly sworn, depose and state as follows:

### BACKGROUND OF AFFIANT

1.     I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). As such, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18. I have been employed as a Special Agent with ATF since April of 2015. I attended the ATF's Special Agent Basic Training Academy located in Glynco, Georgia, for a combined period of 15 weeks. Prior to that, I was a Special Agent with the Drug Enforcement Administration ("DEA") in the Western District of Texas for approximately three and a half years. I have received training, both formal and on-the-job, regarding the federal firearms laws administered under Titles 18 and 26 of the United States Code.

2.     I have undergone various law enforcement training, including firearms training, training relative to conducting drug investigations, training on the execution of search and seizure warrants, training on investigative techniques, which include the collection and analysis of data obtained from search warrants. I have received specialized training in firearms identification and the investigation of firearms-related offenses. I have participated in investigations involving

1

individuals who unlawfully possess firearms, of individuals illegally selling firearms, and of individuals distributing illegal drugs. I have coordinated the controlled purchases of illegal firearms and drugs utilizing confidential sources, cooperating witnesses and undercover law enforcement officers. I have written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the illegal possession and distribution of firearms and drugs. I have conducted electronic and physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of firearms and illegal drugs and provided testimony, in both Grand Jury proceedings and District Court proceedings. I have also spoken with informants and subjects, as well as local, state and federal law enforcement officers, regarding the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal firearms and drugs. In addition, I have been involved in the investigation of street gangs, including gangs with a national presence as well as locally-based gangs. I have received training, both formal and on-the-job, in the provisions of the federal firearms and drug laws administered under Titles 18, 21 and 26 of the United States Code.

     3.     I am currently assigned to the ATF Hartford Field Office and, in conjunction with the Willimantic Police Department ("WPD") and the DEA, I have been conducting an ongoing investigation into **MOHAMMADREZA KAMALI**, a.k.a. "Reza," (DOB: xx/xx/2000) for engaging in the business of importing, manufacturing and dealing in firearms without a license in violation of Title 18, United States Code, Section 922(a)(1)(A).

     4.     This affidavit sets forth facts and evidence that are relevant to the requested arrest warrant and search and seizure warrant, but does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter. Rather, I have only set forth

ATTACHMENT C

the facts that are necessary to establish probable cause to support the issuance of the arrest warrant and the search and seizure warrant.

5.    I submit this affidavit in support of a criminal complaint and application for an arrest warrant charging KAMALI for engaging in the dealing of firearms without a license in violation of Title 18, United States Code, Section 922(a)(1)(A), which is more specifically described in Attachment B (the "TARGET OFFENSE"); and in support of the following two search warrants under Rule 41 of the Federal Rules of Criminal Procedure: (1) 28 Chapman Street, Willimantic, Connecticut (the "TARGET PREMISES"); and (2) information associated with 860mohammadreza@gmail.com (the "TARGET ACCOUNT") stored at the premises controlled by Google LLC, an internet service provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The locations to be searched are described in the following paragraphs and in Attachment A – Location #1 and Attachment A – Location #2. The warrants requested would allow the government to seize the evidence described further in Attachment B – Location #1 and Attachment B – Location #2. With respect to the search of the TARGET ACCCOUNT, which is pursuant to Rule 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), Google LLC will be required to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B – Location #2. Upon receipt of the information described in Section I of Attachment B – Location #2, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

6.    For the reasons set forth herein, I have probable cause to believe and I do believe, that the items described in Attachment B - Location #1 and Attachment B – Location #2, which constitute evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §

3

ATTACHMENT C

922(a)(1)(A) (Dealing without a License) exist at the TARGET PREMISES and within the TARGET ACCOUNT.

## JURISDICTION FOR SEARCH OF TARGET ACCOUNT

7.     This Court has jurisdiction to issue the requested warrants for the TARGET ACCOUNT pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A) because this Court is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that—has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## STATUTORY AUTHORITY

8.     This investigation concerns possible violations of 18 U.S.C. § 922(a)(1)(A), which provides in pertinent part, that "It shall be unlawful . . . for any person . . . except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce."

## INVESTIGATION BACKGROUND AND PROBABLE CAUSE

### *March 2018 Investigation by Willimantic Police Department*

9.     On March 16, 2018, members of the WPD were contacted by Patrick S. who stated that he had located a package, addressed to him, containing gun parts that had been delivered to his address in Willimantic, Connecticut. Patrick S. stated that there was a notification from FedEx that there was a second package that he needed to sign for to receive. Patrick S. stated that he had not ordered anything firearms related and was concerned that the packages were intended for his minor son, P.S. (DOB xx/xx/2003).

4

10.     WPD detectives subsequently interviewed P.S. with the permission of his parents.
P.S. stated that he had been approached by a classmate of his, identified by detectives as KAMALI,
several weeks prior.  P.S. stated that KAMALI asked P.S. if he could ship a package to P.S.'s
house and P.S. stated that he could not.  P.S. stated that sometime after their initial conversation,
KAMALI approached P.S. and told P.S. that he had obtained P.S.'s address of ████████████
Willimantic, CT, from Snap Chat and had sent something to P.S.'s house.  P.S. asked KAMALI
what he had sent and KAMALI responded that he had ordered gun parts.  P.S. stated that KAMALI
asked him if they could go to P.S.'s house to see if the packages had arrived and P.S. refused to
go with him.  P.S. stated further that KAMALI told P.S. that he had 9mm pistols and "ARs" that
he kept in a building that KAMALI's father owned.  P.S. stated that KAMALI never showed him
any of these weapons.

11.     After speaking with P.S., WPD detectives met with KAMALI and his parents at
their residence located at 28 Chapman Street in Willimantic, CT.  KAMALI stated to investigators
that he knew about the gun parts that were shipped to P.S.'s house.  KAMALI claimed that he had
assisted P.S. in ordering them and that P.S. had obtained a pre-paid credit card from Wal-Mart to
make the purchase.  KAMALI stated that, together, they ordered all of the parts to make a working
9mm pistol and that they were then going to put it together themselves.  KAMALI told the
investigators that they had ordered an 80% receiver and that they were going to mill it out and
assemble it.[1]  KAMALI stated that he did not think he was doing anything illegal.  The WPD
detectives explained to KAMALI that he was allowed to order the parts but that assembling the

---

[1] An 80% receiver is a partially completed firearm frame that needs additional special tooling
and skills to complete to the point that it meets the federal definition of a firearm.  80% receivers
are not subject to federal firearms regulations.

5

ATTACHMENT C

firearm would be a violation of the law as he was not yet 21 years old and could not own a pistol. The investigators asked KAMALI if he owned any other firearms and he stated that he had purchased an 80% receiver for an AR-15. KAMALI took investigators to his room, where he was storing the receiver, and provided it the investigators.

12.     On March 21, 2018, WPD detectives were contacted by Patrick S., the father of P.S., who stated that he had received the additional package meant for his son. Patrick S. provided the package to WPD. The package contained an 80% receiver for a Glock pistol, a jig utilized to properly drill the frame, and additional bits and parts to be used to drill and assemble the lower portion of the frame. In total, three packages had been sent to Patrick S.'s residence which included the 80% Glock frame, a Glock slide along with parts and tools to be utilized to fully assemble a Glock pistol. The parts had been shipped from two different companies: Midway USA of Columbia, MO and Glockstore.com of San Diego, CA.

*Willimantic Police Department Refers the Investigation to ATF Hartford*

13.     During the week of September 30, 2018, WPD detectives were contacted by a Confidential Source (CS-1) with information regarding KAMALI. Because CS-1 has provided information to the WPD in the past that has been corroborated, WPD deems him/her to be credible and reliable. CS-1 stated that he/she had been approached by KAMALI who had offered to sell him/her a handgun and/or an assault style long gun that KAMALI would assemble himself. CS-1 stated that KAMALI stated that he could legally order the parts to make the weapon. KAMALI stated that he was aware that it was illegal to sell the weapons but that they would not have any serial numbers. KAMALI stated that he had sold a number of such firearms to various individuals

ATTACHMENT C

in the greater Windham area. Shortly thereafter, WPD contacted the ATF Hartford Field Office
for assistance with the investigation.

14.     A query of the ATF Federal Licensing System determined that neither KAMALI,
nor his father, Mohammad Kamali, who is also known to reside at the TARGET PREMISES,
possess a federal firearms license.

15.     On October 5, 2018, members of the ATF Hartford Field Office contacted Midway
USA who provided purchase history related to P.S. and KAMALI. The information provided by
Midway USA showed that on March 7, 2018, a Glock Extractor Depressor Plunger and a Glock
Slide were purchased and a shipping address in the name of P.S. at "                    
Willimantic, CT" was provided. The contact email provided for this order was the TARGET
ACCOUNT. Additionally, Midway USA showed that on May 4, 2018, a purchase was made in
the name of Mohammad Kamali with a listed address of the TARGET PREMISES. This purchase
was for ammunition reloading die sets; a .223 press kit, and smokeless gun powder, all items used
in the reloading of ammunition.

16.     On October 5, 2018, this affiant contacted Glockstore.com who provided purchase
information related to the 80% polymer Glock frame that was shipped to Patrick S. Glockstore.com
showed the contact email for the purchase as the TARGET ACCOUNT. They also showed that
the Internet Protocol ("IP") address at the time the order payment was processed to be 68.185.116.4.
An IP address is, generally speaking, a unique identifier for a device that allows other devices to
identify it on a network.

ATTACHMENT C

17.     The provider for the IP address of 68.185.116.4 was determined to be Charter
Communications, which subsequently identified that IP address as being registered to Mohammad
Kamali at the TARGET PREMISES.

18.     On October 17, 2018, a Court Order, signed by The Honorable Sarah A.L. Merriam,
United States Magistrate Judge, District of Connecticut, allowed for the installation of a pen
register for the TARGET ACCOUNT, authorizing the interception of the headers of email
messages.

19.     During a review of pen register data for the TARGET ACCOUNT, members of the
ATF determined that on October 23, 2018, the email address received an email from
midway.usa.com.  Additionally, it was determined that on October 25, 2018, the email address
received emails from sales@vizardsgunsandammo.com;  april@tac-llc.com  (subsequently
identified as the Tennessee Arms Company); and customerservice@lonewolfdist.com.  Members
of the ATF Hartford Field Office determined that each of these email addresses are associated with
companies that make and distribute parts used in the assembly of firearms.

20.     On October 26, 2018, members of the ATF Hartford Field Office contacted Lone
Wolf Distributors and determined that on October 20, 2018, an order for a "Fullsize Poly80 Frame
Completion Kit" was purchased by an individual providing a name of "joe kam."  This individual
provided the TARGET PREMISES as the shipping address.  In addition, the IP address used to
place the order was 68.185.116.4, the IP address associated with the TARGET PREMISES.  The
"Fullsize Poly80 Frame Completion Kit" ordered on October 20, 2018 is the prefinished version
of the Glock that an ATF Special Agent acting in an undercover capacity and whose true identity

ATTACHMENT C

is known to the affiant (hereinafter, "UC-1"), purchased from KAMALI on October 25, 2018, as further detailed below.

  21. On that same date, members of the ATF Hartford Field Office contacted Tennessee Arms Company and determined that on October 25, 2018 an order for six 80% AR-15 style receivers was placed by an individual providing a name of "Moe Kam" and utilizing the TARGET ACCOUNT as the associated email address. This individual provided a shipping address of 919 Main Street, P.O. Box #474, 28 Chapman Street, Willimantic, CT, which is the address of the Willimantic Post Office where KAMALI had the UC-1 bring him on October 25, 2018, so that he could apply for a P.O. Box, as further detailed below.

## PACKAGES DELIVERED TO THE TARGET RESIDENCE

  22. Also during the course of this investigation, law enforcement established through the use of surveillance, Willimantic Police Department queries, mail history queries, and other public records searches that, KAMALI resided at 28 Chapman Street along with his parents, Mohammad and Mahbobeh Kamali, and at least one juvenile sibling. Based upon surveillance of the TARGET RESIDENCE, KAMALI appears to be absent from the residence for long periods during the daytime, while the parents remain present at the residence. However, around mid-afternoon hours, Mohammad Kamali (KAMALI's father) appears to leave the residence, and it is believed that it is possible that he may work during the evening hours.

  23. In addition to the October 20, 2018 order from Lone Wolf that was delivered to the TARGET PREMISES, as discussed above, law enforcement have confirmed that a number of similar packages have been delivered to the TARGET PREMISES in the name of KAMALI, in the names of KAMALI's parents, Mohammad and Mahobobeh Kamali, and in a fictitious name

ATTACHMENT C

of "Joe Kam." Given the observed family schedule, it is unclear who is receiving the packages of parts, when they arrive, and/or where they are stored in the residence.

24.     For example, a query with Midway USA determined that in May of 2018 two separate orders were placed in the name of Mohammad Kamali (KAMALI's father), with a listed date of birth of ▓▓▓▓/59 and an address of 28 Chapman Street. The first item was for the purchase of a reloading kit for .223 caliber ammunition. The second order was for reloading supplies to be used for the reloading of .223 caliber ammunition, 9mm caliber ammunition and .300 AAC Blackout caliber rounds.

25.     Although a query with the State of Connecticut Department of Public Safety Firearms Permit and Registration system showed Mohammad Kamali has only three firearms registered in his name; two of which are 9mm pistols and the third is a .38 caliber revolver; he may lawfully purchase the above-listed reloading kits for recreational purposes. Because those packages were delivered to the TARGET PREMISES in Mohammad Kamali's name, KAMALI, who also resides in the residence, reasonably has access to those items.

26.     Similarly, law enforcement also determined on October 30, 2018 from information provided by the U.S. Postal Service that on October 26, 2018 and October 27, 2018 two packages were sent to Mahbobeh Kamali (KAMALI's mother) from Military Pawn & Surplus; on October 24, 2018 a package was sent to an individual named "Joe Kam" at 28 Chapman Street from Optics Planet; and on October 22, 2018 an additional package was sent to 28 Chapman Street in the name of "Joe Kam" from Lone Wolf Distributors. It is this affiant's belief that Joe Kam is a fictitious name utilized by KAMALI.

10

ATTACHMENT C

27.     Given the volume of packages and the various names used on the packages being delivered to the TARGET PREMISES, and the fact that several of those packages were delivered to KAMALI's mother or father as the intended recipient, it is possible that evidence, including tools, equipment (such as reloaders), and ammunition, are maintained by the named recipients within the TARGET PREMISES and that while KAMALI also resides in the TARGET PREMISES, he continues to have access to these materials in furtherance of the charged conduct.

**CONTROLLED PURCHASES**

28.     Unless otherwise specifically noted, all undercover controlled purchases of firearms conducted by UC-1 described herein were audio and visually recorded.  In each instance, UC-1 was provided with electronic surveillance equipment and/or an ATF Special Purpose Vehicle ("SPV") to accomplish the capture of these recordings.   Also set forth below are excerpts from conversations captured by recording devices worn by UC-1.  In the case of text messaging, these quotes were taken from UC-1's undercover phone by this affiant or other Special Agents either by contemporaneous review of the message or by reviewing text message exchanges between UC-1 and KAMALI.

*Controlled Purchase of One (1) Long Gun Style Firearm*
*from KAMALI on October 18, 2018*

29.     On October 16, 2018, UC-1, acting in an undercover capacity, received a text message from KAMALI utilizing telephone number (xxx) xxx-1115.  For all telephone and text message communication that follow in this report, KAMALI used (xxx) xxx-1115 and UC-1 used an undercover cellular telephone.  The purpose of these specific text messages was to arrange a controlled purchase of a firearm by the UC-1 from KAMALI.  During the exchange KAMALI wrote, "Ur order will be done to and it's alot higher quality."  UC-1 responded, "Cool, I will be

11

out there on Thursday, mid afternoon good for you?" KAMALI replied that he would be ready to meet UC-1 on Thursday, October 18, 2018.

30.　　On October 18, 2018, UC-1 and KAMALI spoke on the phone regarding the impending purchase. KAMALI said that he had to sneak the firearm he was going to sell out of his house because his parents did not know about his firearms dealings. KAMALI said that he would call UC-1 back shortly but promised that he would get the firearm to him at some point during the day. KAMALI called UC-1 back several moments later and stated that he would be able to meet with him at 1510 hours and agreed to text UC-1 with the address of where to meet him. Several moments later, UC-1 received a text from KAMALI that read, "130 Chapman Street Willimantic."

31.　　On that same date, at approximately 1440 hours, surveillance was initiated on the TARGET PREMISES. At approximately 1455 hours, UC-1 traveled to the area of 123 Chapman Street. Upon arrival, UC-1 attempted to reach KAMALI via calls and text for several minutes without success. At approximately 1507 hours, surveillance units observed a silver sedan, which was parked in the driveway of the TARGET PREMISES, pull out of the driveway and exit the area. At approximately 1520 hours, UC-1 received a text message from KAMALI that read, "Ok give me 5 minutes." At approximately 1513 hours, surveillance units observed KAMALI walking on the property of the TARGET PREMISES, between the house and the garage, heading in a northwestern direction on Chapman Street towards the location he agreed to meet UC-1.

32.　　At approximately 1514 hours, while driving on Chapman Street, UC-1 saw KAMALI and pulled over in the area of 80 Chapman Street. KAMALI approached on foot and entered the ATF SPV. KAMALI directed UC-1 to an area where he could show the firearm to

ATTACHMENT C

UC-1 and put it together. UC-1 replied that he was not from the area and needed good directions.

KAMALI stated that he thought that UC-1 was from Columbia, CT, as that was where many of

his customers were from. KAMALI directed the UC-1 to the area of the Willimantic Recreation

Park, located at 79 Main Street, Willimantic, CT. KAMALI told UC-1 that it was the area that he

used to go to so he could smoke marijuana.

      33.    Upon arrival at that park, KAMALI took an upper receiver out of his pants and

handed it to UC-1. KAMALI took the upper receiver and screwed a "flash hider" to the end of it.

KAMALI said that the "flash hider" would make the firearm quieter and would hide the flash.

UC-1 asked KAMALI about his manufacturing process and KAMALI responded that the lower

receiver was sometimes difficult to make. KAMALI told UC-1 that the firearm he was selling was

classified as an assault weapon and if UC-1 got caught with it he would be charged with a felony.

KAMALI put the upper and lower receiver together and UC-1 asked KAMALI if the price was

$400.00. KAMALI replied that the price was $500.00 and UC-1 handed KAMALI $500.00 in

recorded ATF Agent Cashier funds.

      34.    KAMALI told UC-1 that he would have a Glock pistol to sell him the following

week. UC-1 replied that he would like to purchase another .223 rifle along with the Glock.

KAMALI replied that the Glock pistol would have a silver slide with a grey frame and would be

made from a "polymer 80." UC-1 questioned KAMALI about where he got his parts from and

KAMALI declined to answer. KAMALI said that the Glock would have no serial numbers on it

and that he would sell it to UC-1 for $500.00. KAMALI stated further that he made a $50 profit

for every Glock that he sold.

ATTACHMENT C

35.     On that same date, UC-1 exchanged a series of text messages with KAMALI.  At approximately 2046 hours, UC-1 received a text that read, "Hey the fucking parts for the g are out of stock could 3 hardware's do?" UC-1 replied, "3 of what i got today?"  KAMALI responded, "Yes…Sorry bout that not having the g the side a barrel are out of stock…Slide*." UC-1 replied, "Yes, can you have the 3 ready by the end of next week?  Thursday prob good for me again…Keep loiking for the G, maybe will get back in stock."  KAMALI responded, "They my place restocks on Mondays by the time I order it's going to be too late so I'll get u 3 Peace's of hardware…On Thursday." UC-1 replied, "ok i will see you on Thursday for those 3, maybe get a G or two the week after if parts are in." KAMALI responded, "Ok great if the parts aren't in by next Wednesday I will just pay the 70 extra out of my pocket…There's a barrel and slide combo for 70 more but there not as good…Not trying to make u pay more than 500 each." UC-1 replied, "ok let me know, if 3 too many i can take fewer, but i can def take all 3."  KAMALI responded, "Don't worry I'll make the 3 happen. U better be flipping them for at least 800 each tho lol."

*Telephone and Text Communications Between UC-1 and KAMALI*

36.     On October 20, 2018, UC-1 received a text message from KAMALI that read, "Fuck man there's too much demand I can't make the hardware and shit fast enough I can only get u 2 hardware but I can get mags also." UC-1 replied, "Ok I will take the 2 with mags. Are you sure you can do 2?"  KAMALI responded, "Yeah I only can make up to 10 a week there's too much demand… How many mags?...5?"  UC-1 replied, "4 mags will be fine."  KAMALI responded, "U sure I can get as many mags as u want."  UC-1 replied, "4 is good for now."

37.     On October 23, 2018, UC-1 returned a call to KAMALI.  KAMALI told UC-1 that he had already sold all of his firearm magazines and would not have any new magazines until

ATTACHMENT C

Friday, October 26, 2018. UC-1 told KAMALI that he would wait on the magazines and would just take the firearms when he saw KAMALI on Thursday. KAMALI said that he had two firearms ready for UC-1. KAMALI stated that he felt bad only having two firearms available for UC-1 because the demand for his product was so high. KAMALI said that he would bring a Glock model 17 lower receiver to show to UC-1. UC-1 told KAMALI that he would purchase the Glock receiver even though it wasn't a fully assembled pistol. KAMALI asked UC-1 how much he would be willing to pay for the Glock receiver, and UC-1 told him $300.00. KAMALI stated that he wanted $350.00, and UC-1 said that he would pay that amount. KAMALI stated that the two .223 rifles would be $500.00 each. KAMALI agreed to meet with UC-1 on Thursday and said that he would have to assemble some parts for the firearms in UC-1's vehicle when they met.

38.      On October 24, 2018, UC-1 exchanged a series of text messages with KAMALI during which KAMALI sent UC-1 photos of the Glock pistol frame he was going to sell him the following day. During the exchange, KAMALI asked, "Ok after this week how many total hardware and gs do u think want 20?...Like how many do u want until u stop buying." UC-1 replied, "I can keep doing 3 or so .223s a week for a while, as for the Gs hold off unitl I can check out the one I get tomorrow before I get more." KAMALI replied, "Ok sounds great."

*Controlled Purchase of Two (2) AR-15 Style Firearms and One (1) Glock Pistol-Type Firearm from KAMALI on October 25, 2018*

39.      On October 25, 2018, the UC-1 contacted KAMALI and agreed to meet in the area of 333 Prospect Street in Willimantic, CT. At approximately 1356 hours, UC-1 arrived in the area and parked. At approximately 1358 hours, UC-1 contacted KAMALI by phone and described his location. At that time, surveillance units observed KAMALI, wearing a backpack, walking east on Prospect Street toward UC-1. At approximately 1359 hours, KAMALI entered the front

15

ATTACHMENT C

passenger seat of the ATF SPV and he and UC-1 proceeded to travel to the Stop & Shop parking lot located on Main Street in Willimantic, CT. KAMALI told UC-1 that he had all of the lower receivers assembled and that he just had to attach the upper receivers to them. KAMALI then showed UC-1 the Glock pistol lower receiver.

40.     Upon arrival at the Stop & Shop parking lot, KAMALI removed the upper and lower receivers for two AR-15 style rifles from his backpack, along with several tools he subsequently used to assemble the rifles. UC-1 commented that the Glock frame did not have a serial number and KAMALI replied, "None of these have serials, which is what you want." KAMALI then assembled both rifles while seated in the front seat of the ATF SPV. KAMALI told UC-1 that the following week he would be able to start selling him "three." KAMALI then stated, "I'm just too much, um what you call it, demand." UC-1 then told KAMALI that he was concerned that KAMALI might sell a gun to someone that would get caught and talk to law enforcement. KAMALI replied, "What they gonna say? The eighteen year old is making ten guns a fucking week?...That shits not gonna hold up in court." UC-1 subsequently reiterated that KAMALI should never tell anyone he was dealing with him. KAMALI replied, "I deal with so many people, I could care less." Prior to the conclusion of the transaction, UC-1 confirmed with KAMALI that he wanted $1,350 for the three guns. KAMALI told UC-1 that he "better at least be getting two grand for this shit." UC-1 stated that he wasn't charging that much. KAMALI then stated, "when I sell to like my actual, uh, my real customers, uh, yeah they don't want any discount price they want to pay the full price because they're mafia guys and they respect what I do." UC-1 subsequently provided KAMALI with $1,350 for the two rifles and the Glock frame. KAMALI

16

ATTACHMENT C

and UC-1 agreed to meet again the following Thursday so that UC-1 could purchase three more rifles.

41.     KAMALI then asked UC-1 to drive him to the Post Office so he could acquire a large post office box. While traveling to the post office, KAMALI stated that he had sold the third rifle that he had prepared for UC-1 to a friend that needed it. KAMALI stated that his friend had a customer that was going to charge "two grand" for the gun so KAMALI felt like he had to sell the gun to his friend. KAMALI also stated that he was about to purchase several lower receivers all at once.   UC-1 and KAMALI arrived at the post office, located at 919 Main Street in Willimantic, CT, at approximately 1445 hours.   Surveillance units observed KAMALI exit the front passenger seat of the ATF SPV vehicle and enter the post office.   At approximately 1515 hours surveillance units observed KAMALI exit the post office and walk out of the area.

42.     The following day, on October 26, 2018, members of the ATF Hartford Field Office contacted Lone Wolf Distributors and determined that on October 20, 2018 an order for a "Fullsize Poly80 Frame Completion Kit," was purchased by an individual providing a name of "joe kam" to be shipped to the TARGET PREMISES using the IP address associated with the TARGET PREMISES. The "Fullsize Poly80 Frame Completion Kit" ordered on this date is the prefinished version of a Glock pistol, the same type of Glock pistol that KAMALI sold to UC-1 during this controlled purchase.

43.     On that same date, members of the ATF Hartford Field Office contacted Tennessee Arms Company and determined that on October 25, 2018 an order for six 80% AR-15 style receivers was placed by an individual providing a name of "Moe Kam" with and the email address of the TARGET ACCOUNT. This individual provided a shipping address of 919 Main Street,

17

ATTACHMENT C


## ATTACHMENT A

## PLACE TO BE SEARCHED

### Location #1: 28 Chapman Street, Willimantic, CT

This structure is a two story, single-family home that has light-green vinyl siding with white trim. The building is located on Chapman Street in Willimantic, CT. There is a driveway and a two-car garage on the property, just northeast of the residence. To the right of the front door the residence is clearly marked with the number "28."





## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED

**Location #1: 28 Chapman Street, Willimantic, CT**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use of which is or has been used as the means of committing a criminal offense, namely, violations of 18 U.S.C. § 922(a)(1)(A) (the "TARGET OFFENSE"), including:

a.  United States currency, money orders and other financial instruments that were documented during the course of the purchases made by ATF or that can otherwise be shown to have been obtained through the unlawful distribution of firearms;

b.  books, records, receipts, notes, ledgers, and other papers and documentation relating to the communication, orders and processing, storage, transportation, payment, acquisition and/or distribution of firearms, firearms parts, and/or tools and equipment used in the manufacture of firearms;

c.  records of firearms transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in firearms trafficking activities;

d.  tools, drill bits, machining items and other evidence that supports the manufacturing of firearms;

e.  cellular telephones, mobile telephone bills and address books and any other records or document reflecting the telephone numbers.

f.  addresses or telephone numbers in books, papers, cellular telephones, tablets or computers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and communications to or from their associates and/or clients in firearms trafficking activity and/or suppliers of firearms, firearms parts and/or tools and equipment used in the manufacture of firearms; photographs and videotapes of participants and associates in firearms trafficking activity and property acquired as a consequence of firearms trafficking activities;

g.  firearms, ammunition and other weapons;

h.  safes and other secure storage containers and their contents;

i.  identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.

ATTACHMENT C

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

**Location #2: Google, LLC**

I.      **Information to be disclosed by the provider listed on the search warrant**

To the extent that the information described on the Search Warrant is within the possession, custody, or control of the provider, including any emails, records, files, logs, or information that has been deleted but is still available to the provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the provider is required to disclose the following information to the government for 860mohammadreza@gmail.com ("TARGET ACCOUNT"), for the time period of March 7, 2018 to the present:

a.      The contents of all emails associated with the TARGET ACCOUNT, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each e-mail, the date and time at which each email was sent, the size and length of each e-mail, and any and all attachments to each e-mail;

b.      All records or other information regarding the identification of the TARGET ACCOUNT, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the TARGET ACCOUNT was created, the length of service, the IP address used to register the TARGET ACCOUNT, log-in IP addresses associated with session times and dates, account status, account change history, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      Any and all content of services utilized by the TARGET ACCOUNT, including but not limited to Android, Gmail, Blogger, Google Calendar, Google Chrome Sync, Google

ATTACHMENT C

Developers Console, Google Docs, Google Drive, Google Hangouts, Google My Maps, Google

Payments, Google Photos, Google Play, Google Play Music, Google URL Shortener, Google+,

Wallet Transfer, Web & App Activity, iGoogle, Has Google Profile, Has Plusone, Location

History, Web History, and YouTube;

      d.     All records or other information stored at any time by an individual using the

TARGET ACCOUNT, including address books, contact and buddy lists, calendar data, pictures,

and files;

      e.     All records pertaining to communications between the provider and any person

regarding the account, including contacts with support services and records of actions taken; and

      f.     The identity, subscriber information, and account change history (but not the

contents) of any accounts that share a browser cookie with the TARGET ACCOUNT.

**II.     Information to be seized by the government**

      a.     All information described above in Section I, including photographs, images,

videos, correspondence, communications, records, documents, electronic mail, electronic

messages, chats, chat logs, notes, and other materials, in any format, that constitute fruits,

evidence and instrumentalities of the crime of dealing without a license in violation of 18 U.S.C.

§ 922(a)(1)(A), including records of any purchase, sale, or other transaction concerning firearms,

ammunition, or materials involved in the manufacture of firearms; records of communications

with any online retailer of firearms materials or components; records pertaining to shipping or

storage of any transactions involving firearms materials or components; or records pertaining to

use of post office boxes.

      b.     Credit card, financial information, and other information, including, but not

limited to, bills and payment records, evidencing ownership of the TARGET ACCOUNT;

ATTACHMENT C

      c.      Evidence of who used, owned, or controlled the TARGET ACCOUNT;

      d.      Evidence of the times the TARGET ACCOUNT was accessed or used; and

      e.      Passwords and encryption keys, and other access information that may be

necessary to access the TARGET ACCOUNT listed on Search Warrant.